Filed 1/20/21  P. v. Camarillo CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JESUS CAMARILLO,<br><br>    Defendant and Appellant. | A155577<br><br>(Solano County<br>Super. Ct. No. FCR331711) |

A jury found appellant Jesus Camarillo guilty of second degree murder (Pen. Code, §§ 187, subd. (a); 189, subd. (b))[1] and attempted murder (§§ 187, 664).  The jury found firearm enhancements true as to each count (§ 12022.53, subds. (c), (d)).  Appellant was sentenced to 47 years to life in prison.  On appeal, he raises various claims, including that the trial court committed prejudicial error by failing to instruct the jury to consider his youth as part of the instructions on self-defense.  We remand for resentencing but otherwise affirm the judgment.[2]

---

[1] All undesignated statutory references are to the Penal Code.

[2] By separate order filed this date, we deny appellant's related petition for writ of habeas corpus (A160365) raising claims of ineffective assistance of counsel and cumulative error.

1

FACTUAL AND PROCEDURAL BACKGROUND

I.    *The Evidence*

   A.    *The Fight at the 7-Eleven Convenience Store*

On December 10, 2016, Sureño gang members, Jorge H. and the 16-year-old appellant,[3] were hanging out with associates, Sevren M. and Joel M.[4] The four drove to a 7-Eleven in Fairfield, located in territory claimed by Sureños. Once there, they encountered rival Norteño gang members, Ernesto G. and Eduardo R., who were both wearing red—the color claimed by Norteños. Elena J. accompanied the two men.

Appellant and Sevren M. went inside the store; Joel M. remained in the car; and Jorge H. stood at the store's doorway. When the other three persons approached the store, Jorge H. said to them, "What the fuck?" In return, they called him a "scrap," a derogatory term for Sureños. Ernesto G. and Jorge H. began fighting. According to Elena J., at some point, Jorge H. said "to stay right there because he had something for us and we could get smoked on the tracks." He retreated to the car. Joel M. then got out of the car and began fighting with Ernesto G. Eduardo R. was "just laughing at the situation." Sevren M. and appellant came out of the store and stood by the car.

The fight between Joel M. and Ernesto G. "stopped after a couple of seconds and they all started standing around and just looking at each other." Although he did not see a gun, Jorge H. thought Eduardo R. had one because he "had his hand on his side and he said something along the lines of: Y'all don't want none, y'all don't want it?"

---

[3] Following a transfer hearing in the juvenile court, appellant was deemed fit to be tried as an adult. (Welf. & Inst. Code, § 707, subd. (b)(1).)

[4] To protect the privacy interests of victims and witnesses, we refer to them by their first name and last initial. (Cal Rules of Court, rule 8.90.)

Appellant and his friends got in the car, but not before Elena J. attacked Jorge H., who did not fight back. She continued "banging on the hood of the car, kicking it, punching it, yelling Norte." Ernesto G. threw a beer can at the car, and "it splattered everywhere."

Jorge H. drove toward the two men and the woman "to scare them off," hitting the curb. Sevren M. claimed that Eduardo R. "stabbed the front tire." Sevren M. did not see a knife, but he heard air coming out of the tire after Eduardo R. got close to the car. As the car was leaving, one of the men in red "grabbed . . . [a] trash can top and threw it at the car."

Appellant was not involved in the fight or the name calling at the 7-Eleven.

### B. *Jorge H. Gets a Gun*

After they left, Jorge H. was "bummed," "in a down mood," and he "[f]elt like a bitch." He felt threatened at the 7-Eleven and worried about losing respect for being pushed out of Sureño territory. They drove to his house, two or three blocks away, where he retrieved a loaded revolver that he gave to Joel M. According to Jorge H., "Sevren [M.] wanted to fight them again and Joel [M.] joined in, so I told them: If you see them niggas, let [me] know." Although the others were "hyped up," appellant was quiet.

When they drove back to the 7-Eleven parking lot, they did not see the group in red. Jorge H. and Joel M. noticed something was wrong with the car, so they pulled into a nearby shopping center close to a taco truck. They realized the car had a flat tire. By this time, Jorge H.'s anger had dissipated, and "it was over as far as I was concerned." He testified that Joel M. handed the gun to appellant who put it in his waistband. They began changing the flat tire.

3

C.    *The Two Groups Meet Again*

After the 7-Eleven fight, Elena J., Ernesto G., and Eduardo R. went across the street to an apartment.  Sulpicio R., who was Elena J.'s boyfriend, and the father of her child, was there.  Sulpicio R. was also a Norteño gang member.  Elena J. told the group that Jorge H. hit her at the 7-Eleven, which was not true.  She did so because she was angry.  When he heard this, Sulpicio R. became upset.  Elena J., Eduardo R., and Sulpicio R. left the apartment to walk to a nearby liquor store.  Sulpicio R. was wearing a red and black jacket.

Elena J. or Eduardo R. noticed the group of four from the 7-Eleven fixing their tire by a taco stand.  Elena J. felt there would be another fight, and she wanted to go back to the apartment.  Sulpicio R. said, "No. Fuck that."  Elena J. used her cellphone to call the apartment.  Ernesto G. came to the area after Elena J. made the call.

Joel M. told Jorge H. that the people who attacked them at the 7-Eleven were back.  Eduardo R. and Sulpicio R. approached Jorge H. and his group with a belligerent attitude, like they wanted to fight.  The two groups "were talking shit to each other."

D.    *The Shootings*

Sulpicio R. asked Jorge H., "What's up, bro?"  Eduardo R. was "pacing behind" and "clutching on his side as if he had a gun."  Appellant and Sevren M. were on either side of Jorge H., and Joel M. was standing behind.  Appellant was "standing more in front" of the others.

Sulpicio R. said, "What's up?  What's up?  Let's go to the back and we can do whatever back there."  Sulpicio R. wanted to fight, and Jorge H. "was okay with it."  According to Elena J., Jorge H. was throwing up gang symbols,

4

and saying, "Do you guys know where you're at?" Sulpicio R. or Eduardo R. called the group of four, "scraps."

Sulpicio R. was "holding the middle of his pants." He unzipped his jacket and took "three . . . aggressive steps" forward toward appellant. Jorge H. thought Sulpicio R. was going to attack appellant. Appellant pulled out the gun and shot Sulpicio R. three times. Eduardo R. began to run, and appellant chased after him. Jorge H. heard two more gunshots.

Sevren M. testified that appellant fired three shots in quick succession. After the first shot, Sulpicio R. grabbed "towards his shoulder" before turning and trying to run. About a minute later, as he was running from the area, Sevren M. heard two more gunshots.

Elena J. testified that Sulpicio R. said, "Watch out. He's got a gun," and then began running towards a laundromat. As he was running, "his arm went limp and he fell in that ditch." Appellant was "a distan[ce] away" from Sulpicio R. when he fired three shots. Appellant then chased after Eduardo R., and Elena J. heard two more gunshots.

According to an independent witness, Eduardo R. was holding Sulpicio R. back. Sulpicio R. was trying to take his shirt off and took a fighting stance. Before Sulpicio R. could get his shirt off or break away from Eduardo R., three shots were fired. At that point, Eduardo R. and Sulpicio R. were approximately 20 or 25 feet from the group of four. Sulpicio R. had nothing in his hands. His body bent, he turned, and he ran towards the laundromat. Less than a minute later, there were three more shots.

This witness observed no weapons, except for the gun used by appellant. Jorge H. did not see anyone display a weapon at either the 7-Eleven or at the taco truck. Sevren M. testified Sulpicio R. did not have a

5

knife or gun in his hands. Elena J. also testified that Sulpicio R. had no weapon during the argument.

E. *The Investigation*

When a police officer responded, she did not find a weapon on Sulpicio R.'s person. However, a knife was found on the ground in the parking lot near the laundromat.

An autopsy of Sulpicio R. indicated he suffered three gunshot wounds: two to the back and one to the back of his left arm.

Video surveillance footage from the scene showed appellant chasing Eduardo R. and shooting at him twice. During his police interrogation, appellant admitted he was at the 7-Eleven but said he went home afterwards and was not present at the taco truck shooting.

The defense rested without presenting evidence.

II. *Verdicts and Sentence*

The jury found appellant not guilty of first degree murder, but guilty of the second degree murder of Sulpicio R., and guilty of the attempted murder of Eduardo R. The jury had been instructed that, as to each count, it could only find one of the firearm enhancements true. Specifically, it was instructed that it could not find a "lesser" enhancement true unless it first found that any greater enhancement was not true. Contrary to these instructions, the jury initially completed verdict forms with true findings for all the firearm enhancements as to each count.

The court informed the jury that they had erred and sent them back for further deliberations. As to the finding of murder, the jury returned the verdict forms with the lesser enhancements of use and intentional discharge of a firearm (§ 12022.53, subds. (b), (c)) crossed out, and, as to the finding of attempted murder, the jury crossed out the lesser enhancement of use of a

6

firearm (§ 12022.53, subd. (b)).  The court accepted the findings of intentional discharge of a firearm causing death (§ 12022.53, subd. (d); count 1) and intentional discharge of a firearm (§ 12022.53, subd. (c); count 2).  The jury did not find true the allegations that appellant committed the crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

At sentencing, the trial court declined to strike the firearm enhancement as to the conviction for murder.  Consequently, it sentenced appellant to an indeterminate term of 15 years to life plus 25 years to life for the enhancement.  As to the attempted murder, the trial court struck the firearm enhancement and imposed the midterm of seven years consecutively.  As a result, appellant's total sentence was 47 years to life.  The trial court also imposed various fines and fees.

## DISCUSSION

On appeal, appellant makes seven arguments.  First, he contends the trial court should have instructed the jury to consider his youth as part of the instructions on self-defense.  Second, he argues defense counsel was ineffective for failing to request such an instruction.  Third, appellant contends that part of the jury instruction on imperfect self-defense was improper.  Fourth, he argues defense counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct during closing arguments.  Fifth, appellant claims the cumulative effect of these errors was prejudicial.  Sixth, he contends we should remand for the trial court to consider imposing a lesser firearm enhancement in connection with the second degree murder conviction.  Seventh, appellant challenges the imposition of fines and fees.  We address each argument in turn.

7

I.      *No Prejudicial Error in Failing to Instruct the Jury to Consider*
        *Appellant's Youth in the Self-Defense Instructions*

Appellant argues the jury should have been instructed to consider his
"youth as a factor in determining whether he subjectively believed in the
need to use deadly force, and whether his belief was objectively reasonable."
We conclude the error, if any, was harmless.

        A.      *Governing Law*

Murder is "the unlawful killing of a human being . . . with malice
aforethought." (§ 187, subd. (a).) Malice exists "when an unlawful homicide
was committed with the 'intention unlawfully to take away the life of a fellow
creature' (§ 188), or with awareness of the danger and a conscious disregard
for life." (*People v. Rios* (2000) 23 Cal.4th 450, 460.) First degree murder
includes "any . . . kind of willful, deliberate, and premeditated killing."
(§ 189.)

The crimes of second degree murder and voluntary manslaughter are
lesser included offenses of first degree murder. (*People v. Seaton* (2001)
26 Cal.4th 598, 672 [second degree murder]; *People v. Randle* (2005)
35 Cal.4th 987, 994 [manslaughter], overruled on other grounds by *People
v. Chun* (2009) 45 Cal.4th 1172, 1201.) Second degree murder is "an
unpremeditated killing with malice aforethought." (*Seaton*, at p. 672.)
Voluntary manslaughter is an intentional, unlawful killing committed
without malice. (*People v. Rios*, *supra*, 23 Cal.4th at p. 460.) A defendant
lacks malice when he acts in a " ' " 'sudden quarrel or heat of passion,' " ' "
or kills in " ' "the unreasonable but good faith belief in having to act in self-
defense." ' " (*Ibid*.)

"If the issue of provocation or imperfect self-defense is . . . 'properly
presented' . . . , the People must prove beyond reasonable doubt that these
circumstances were lacking in order to establish the murder element of

8

malice." (*People v. Rios*, *supra*, 23 Cal.4th at p. 462, italics omitted.)  In other words, "if the fact finder determines the killing was intentional and unlawful, but is not persuaded beyond reasonable doubt that provocation (or imperfect self-defense) was absent, it should acquit the defendant of murder and convict him of voluntary manslaughter." (*Ibid.*)

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  [Citation.]  If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter.  [Citation.]  To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable.  [Citations.]  As the Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person . . . .'  [Citations.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, footnote omitted (*Humphrey*).)

B.      *The Jury Instructions on Self-Defense*

Here, the trial court instructed the jury on perfect and imperfect self-defense.  Based on CALCRIM No. 505, the jury was instructed that "[t]he defendant acted in lawful self defense if:  [¶]  1.  The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;  [¶]  2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;  [¶]  AND [¶]  3.  The defendant used no more force than was reasonably necessary to defend against that danger.  [¶] . . . [¶]  When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would

9

have believed. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the killing and or attempted killing was not justified."

The jury was also instructed on imperfect self-defense based on CALCRIM No. 571. This instruction stated: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self defense. [¶] . . .The difference between complete self defense and imperfect self defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable. [¶] . . . [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self defense."[5]

C.     *Appellant's Claim of Instructional Error as to Reasonable Belief*

Appellant claims the foregoing instructions "did not go far enough." He contends the jurors should have also been told to consider, specifically, his youth when deciding whether his belief in the need to use deadly force was reasonable. He relies primarily on *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 277 (*J.D.B.*), in which the United States Supreme Court held that consideration of a suspect's age or youth is relevant when determining

---

[5] The jury was instructed similarly as to the attempted murder charge.

whether the suspect is in custody for purposes of a *Miranda*[6] analysis, and that "its inclusion in the custody analysis is consistent with the objective nature of that test."

The United States Supreme Court explained that "children as a class" are generally less mature and less responsible than adults, and they are more susceptible to outside pressures, and, as a result, a child's age may affect how a reasonable person in the suspect's position would perceive his or her freedom to leave. (*J.D.B.*, *supra*, 564 U.S. at pp. 271–273.) This inquiry remains objective because a child's age is not a "personal characteristic," and "considering age in the custody analysis in no way involves a determination of how youth 'subjectively affect[s] the mindset' of any particular child." (*Id.* at p. 275.) Relying primarily on this case,[7] and studies of brain development, appellant argues "juveniles cannot be held to the same 'reasonable person' standard as an adult."

Assuming without deciding that the jury should have been instructed specifically to consider appellant's youth in determining the reasonableness of any belief he had in the need to act in self-defense, and also assuming the more rigorous test of prejudice from *Chapman v. California* (1967) 386 U.S. 18 applies, we conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.* at p. 24.) Here, the jury was convinced beyond a reasonable doubt that appellant did not actually[8]

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

[7] Appellant also cites *Roper v. Simmons* (2005) 543 U.S. 551, and *Graham v. Florida* (2010) 560 U.S. 48, but these cases concern appropriate punishments for juveniles.

[8] In discussing whether an individual actually believed in the need for self-defense, courts sometimes use the phrase "subjectively" in lieu of or in addition to the phrase "actually." For simplicity, we employ "actually" in all

11

believe in the need for self-defense because the jury convicted him of second degree murder, not voluntary manslaughter. Having so found, the jury was not required to determine whether any such belief was reasonable.

Of course, appellant contends the jury was also misinstructed as to his actual belief in the need for self-defense—a point we turn to below. Nevertheless, to put a fine point on our conclusion here, appellant's alleged misinstruction as to the reasonableness of his belief is only potentially prejudicial if the jury found he actually held that belief—which did not occur here. That is to say, had he been convicted of voluntary manslaughter, rather than second degree murder, we would be obliged to consider his claim. We turn now to appellant's claim that the jury was also misinstructed as to his actual belief in the need for self-defense.

        D.     *Appellant's Claim of Instructional Error as to Actual Belief*

Appellant contends the jury instructions on perfect and imperfect self-defense were erroneous because "[g]iven the manifest . . . differences between juvenile and mature adult minds, it was essential for jurors to have been instructed to consider youth in assessing . . . whether Camarillo actually believed in the need to use lethal force."

In *J.D.B.,* the United States Supreme Court explained that considering a child's age in a custody analysis is an objective inquiry, not a subjective one. (*J.D.B.*, *supra*, 564 U.S. at pp. 271–276.) Indeed, when discussing *J.D.B.* in a case involving a juvenile's alleged postwaiver invocation of his *Miranda* rights, the California Supreme Court stated that "nothing in *J.D.B.* calls for application of a subjective test to determine juvenile postwaiver invocations." (*People v. Nelson* (2012) 53 Cal.4th 367, 383, fn. 7.)

---

its forms. Similarly, the phrase "objectively" is often used in lieu of or in addition to "reasonably" when discussing the other aspect of self-defense. We employ "reasonably" in all its forms.

Appellant also relies on *People v. Mathews* (1994) 25 Cal.App.4th 89, 93–94, in which a defendant with substantial hearing and vision loss was convicted of exhibiting a firearm in the presence of a peace officer. The jury was instructed, *inter alia*, that the crime required that the individual know or reasonably should know that the other person was a peace officer. (*Id.* at p. 98, fn. 2.) The trial court rejected Mathews's request that the jury, in essence, be instructed that the reasonableness of his belief be judged in terms of his sensory impairments. (*Id.* at pp. 98–99.) The appellate court reversed, finding: "What is 'apparent' to a reasonable person who can see and hear is not 'apparent' to a person who is blind and hearing impaired." (*Id.* at p. 100.)

These cases, arguably, support the proposition that youth is a relevant factor as to whether an individual reasonably believed in the need to act in self-defense. However, they do not support the proposition that a jury must be specifically instructed that youth is a relevant factor when considering what a defendant actually believed.

We recognize that in *Humphrey, supra,* 13 Cal.4th at pages 1088 to 1089, our high court held that expert testimony regarding intimate partner battering "is generally *relevant* to the reasonableness, as well as the subjective existence, of defendant's belief in the need to defend, and, to the extent it is relevant, the jury may *consider* it in deciding both questions."[9] And in *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 (*Sotelo-Urena*), Division Two of this court held that "expert testimony on chronic homelessness was relevant to the issue of defendant's actual belief in the

---

[9] Previously referred to as "battered women's syndrome" (see *Humphrey, supra,* 13 Cal.4th at p. 1076), the preferred terminology is now "intimate partner battering." (Evid. Code, § 1107, subd. (f); *People v. Wright* (2015) 242 Cal.App.4th 1461, 1492, fn. 11.)

13

need to use lethal force to defend himself," and it "was also relevant to the reasonableness of his belief." (*Id.* at p. 750.)

We agree that appellant's age is a relevant factor in determining what he actually believed. But we disagree with his contention that the trial court was required to provide a specific instruction on youth or that defense counsel should have requested one, and neither *Humphrey* nor *Sotelo-Urena* support that contention. Here, the jury was instructed, in determining what the defendant actually believed, to "consider all the circumstances as they were known and *appeared to the defendant*." (Italics added.) Implicit in this instruction is a requirement to consider how the situation appeared to this 16 year old.[10]

Second, there can be no doubt the jury was aware of appellant's age. For example, in his police interrogation, which was video-recorded and viewed by the jury, appellant said he was 16 years old and in 10th grade. Here, unlike in *Humphrey*, *supra*, 13 Cal.4th at pages 1076 to 1077, or *Sotelo-Urena*, *supra*, 4 Cal.App.5th at pages 741 to 743, the defendant was not precluded from presenting evidence or prevented from having the jury consider evidence in a particular manner. Indeed, during closing arguments, appellant's counsel expressly drew attention to his age, describing appellant as a "young man," and stating, "I doubt my client's ever shaved. He's just a kid."[11]

---

[10] In his briefing, appellant undercuts his argument that more was needed when he acknowledges, "everyone experiences adolescence," but not everyone suffers from intimate partner battering, chronic homelessness, or sensory impairments.

[11] In his reply brief, appellant suggests that, as a result of the jury instructions on self-defense, the "jurors would have disregarded defense counsel's argument urging them to consider appellant's youth." We discern no conflict between defense counsel's argument and the jury instructions

14

Finally, there is very little evidence that appellant actually believed he was in imminent danger or needed to use deadly force during the incident at the taco truck. In his police interrogation, appellant denied he was even at the taco truck location where the shooting occurred. There was testimony that Sulpicio R. acted aggressively, and Jorge H. thought Sulpicio R. was going to attack appellant. Additionally, the People's gang expert opined it would be risky for Norteño gang members to go into rival territory unarmed. However, Sulpicio R. was about 20 to 25 feet away when appellant began shooting, and no one observed that Sulpicio R. or anyone else had a weapon at the scene. Appellant essentially shot Sulpicio R. from behind and then chased Eduardo R., firing at least two more shots at him.

Based on this record, we conclude beyond a reasonable doubt, that a jury instruction pinpointing appellant's youth as a factor to be considered when determining whether he actually believed in the need for self-defense would not have changed the murder verdict. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

II.　　*Appellant's Ineffective Assistance of Counsel Claim Based on the Jury Instructions*

Next, appellant argues he "was denied his Sixth Amendment right to effective counsel . . . because his trial attorney should have, but failed to request an instruction on youth." We are not persuaded.

An appellant who contends he received ineffective assistance has the burden of proving: (1) trial counsel's performance was deficient in that it fell below an objective standard of reasonableness when measured by prevailing professional norms; and (2) there is a reasonable probability that, but for

which told the jurors to "consider all the circumstances as they were known and appeared to the defendant," who was 16 years old.

15

counsel's errors, the result of the proceeding would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215–218; *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Appellant cannot establish prejudice. Having found, *ante*, that the failure to provide instructions on self-defense that specifically mention appellant's youth was harmless beyond a reasonable doubt, we also conclude that there is no reasonable probability that instructing the jury in this manner would have altered the verdict. Because appellant cannot show prejudice, this ineffective assistance of counsel claim fails. (*People v. Boyette* (2002) 29 Cal.4th 381, 430–431 [appellate court need not determine whether counsel's performance was deficient if there was no prejudice].)

III. *No Prejudicial Error in the Instruction on Imperfect Self-Defense*

Appellant argues it was error to instruct the jury that " '[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.' " Appellant contends there was "no factual basis" for this part of the instruction, and he complains it led the prosecutor to argue that appellant and his group "became the aggressors when . . . [Jorge H.] retrieved a weapon." We are not persuaded.

A. *If the Instruction Did Not Apply, Appellant Suffered No Prejudice*

First, if there was no factual basis for the instruction, the jury would not have applied it. Here, the jury was instructed, based on CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed this instruction.

16

(See *People v. Chism* (2014) 58 Cal.4th 1266, 1299.) If there was no factual support for this part of the instruction on imperfect self-defense, then it is not reasonably probable the verdict would have been different because the jury would not have applied it. (*People v. Debose* (2014) 59 Cal.4th 177, 205–206 [" 'error of instruction on an inapplicable legal theory is reviewed under the reasonable probability standard' " of *People v. Watson* (1956) 46 Cal.2d 818, 836].)

In arguing otherwise, appellant relies on *People v. Vasquez* (2006) 136 Cal.App.4th 1176, but his reliance is misplaced. In *Vasquez*, the victim was choking the appellant when the appellant drew his gun and shot the victim, and the trial court refused to provide any instruction on imperfect self-defense. (*Id.* at pp. 1178, 1179.) Here, by contrast, the jury was instructed on self-defense and imperfect self-defense. The challenged phrase was a correct statement of the law. (*People v. Enraca* (2012) 53 Cal.4th 735, 761.) At best, appellant contends, the jury might have disregarded the general instruction (CALCRIM No. 200) and applied the phrase to evidence that appellant argues does not exist. To state his claim is to reject it.

B.    *The Prosecutor Did Not Misstate the Law of Self-Defense*

Next, appellant argues the challenged aspect of the instruction in combination with the prosecutor's closing arguments resulted in prejudicial error. We are not persuaded.

Appellant faults the prosecutor for arguing that what happened at the 7-Eleven "didn't matter." But the prosecutor did not make this argument; instead, she argued appellant and his friends returned with a gun to seek retaliation for what occurred at the 7-Eleven. This argument was well within the bounds of acceptable advocacy. Indeed, prosecutors have "wide latitude to discuss and draw inferences from the evidence at trial. [Citation.]

17

Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

Appellant claims the prosecutor misstated the law by arguing appellant "could not invoke self-defense because [Sulpicio R.] wasn't there for the first attack at the 7-Eleven." Once again, appellant mischaracterizes the prosecutor's argument. The prosecutor argued appellant did not actually believe he was in imminent, immediate danger because Sulpicio R. was "a substantial distance away. Not a single punch has been thrown at the taco truck. [And Sulpicio R.] was not a part of the 7-Eleven fight at all." This is permissible argument that directly addresses an aspect of appellant's self-defense claim; namely, whether he actually believed he was in imminent danger when Sulpicio R. advanced toward him. (*People v. Dennis*, *supra*, 17 Cal.4th at p. 522 [reviewing court must view alleged objectionable statements "in the context of the argument as a whole"].)

Appellant complains about the prosecutor's statements that appellant and his "crew" became the "aggressor" when they returned with a gun, and the prosecutor argued self-defense "does not apply once you become the aggressor." But the prosecutor never stated, as appellant suggests, that once Jorge H. retrieved the gun, appellant "forever forfeited his right to self-defense, and perhaps his life, no matter what." Instead, the prosecutor told the jury to focus on appellant's "intent" when he shot Sulpicio R., and that the jury was there to decide what appellant did "and . . . his state of mind when he did it." This argument did not misstate the law. (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at p. 745 ["A defendant claiming self-defense or imperfect self-defense is required to 'prove his own frame of mind.' "].)

Appellant claims the prosecutor should not have argued he had a "duty to retreat." But the prosecutor did not do so; instead, when discussing

18

whether appellant "had time to think" about his decision to shoot Sulpicio R., the prosecutor pointed out that the two groups were arguing, and appellant "did not walk away. He stood his ground out in front because he has the gun." Once again, when viewed in context, this statement was "fair comment on the evidence." (*People v. Gray* (2005) 37 Cal.4th 168, 216.)

Regarding the prosecutor's rebuttal argument, appellant claims she told the jury he "had no right to self-defense unless and until he was physically attacked." Not so. Instead, when discussing whether appellant believed he was "instantly about to die or suffer great bodily injury," the prosecutor pointed out that "[n]ot one punch was thrown at the taco truck yet. These are just a bunch of guys challenging each other to a fight." Finally, appellant takes issue with the prosecutor's example of a situation where self-defense would apply, claiming it was "too narrow." The prosecutor referenced a situation of defending oneself and one's family against home invasion. But, of course, it was just an example, and the prosecutor relied on it to argue that appellant had to believe he was in imminent danger and that the use of deadly force was necessary to defend against the danger. These rebuttal statements and the prosecutor's example were permissible advocacy and fair comment on the evidence. (*People v. Gray*, *supra*, 37 Cal.4th at p. 216.)

In arguing prejudicial error, appellant relies on *People v. Ramirez* (2015) 233 Cal.App.4th 940, but the case is inapposite. In *Ramirez*, the Court of Appeal determined that, under the facts of the case, the jury instruction on contrived self-defense, CALCRIM No. 3472, in combination with the prosecutor's closing argument, prevented the jury from considering a self-defense claim. (*Ramirez*, at pp. 945–948.) Specifically, the court found that CALCRIM No. 3472 was incomplete to the extent it suggested an aggressor

19

may never claim self-defense—a point repeatedly echoed there by the prosecutor in argument. (*Ibid.*) But here, the jury did not receive CALCRIM No. 3472, and, having reviewed the challenged statements, the prosecutor did not misstate the law. We reject appellant's claim that he suffered prejudicial error as a result of the challenged aspect of the instruction on imperfect self-defense.

IV. *Appellant's Ineffective Assistance of Counsel Claim Based on the Failure to Object During Closing Arguments*

Appellant concedes his defense counsel did not object to the prosecutor's alleged "misstatements of the law," and he recognizes that his claim of prosecutorial misconduct based on these statements must be deemed forfeited. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal."].) Appellant, therefore, argues he was denied effective assistance of counsel as a result of the failure to object to the prosecutor's statements. We are not persuaded.

A prosecutor's behavior violates the federal Constitution when it comprises an egregious pattern of conduct that infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) " 'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Ibid.*) "However, prosecutors have wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences and deductions from it." (*People v. Leon* (2015) 61 Cal.4th 569, 606.)

Here, in arguing prosecutorial misconduct occurred, appellant relies on the same alleged misstatements of the law addressed *ante*. But, as explained, the prosecutor did not misstate the law of self-defense during closing and rebuttal arguments. The underlying theme of appellant's challenge is that the prosecutor implied appellant "forever lost his right to self-defense" when he took possession of the gun that Jorge H. retrieved after the fight at the 7-Eleven. But, as already explained, the prosecutor simply drew attention to the requirements of self-defense, and what the jury could infer regarding appellant's frame of mind when Sulpicio R. advanced toward him. Her statements were fair comment on the evidence. (*People v. Leon*, *supra*, 61 Cal.4th at p. 606.)

Because the prosecutor did not misstate the law, defense counsel was not required to object to the statements. (*People v. Ledesma*, *supra*, 43 Cal.3d at pp. 215–218.) The ineffective assistance of counsel claim fails.

V.     *No Cumulative Error*

Next, appellant contends the cumulative effect of these errors was prejudicial. He claims "there was substantial evidence of self-defense, but the jury got derailed by the instructions given and not given," including the failure to instruct the jury to consider appellant's youth, and by the prosecutor's misstatements of the law.

We disagree. We have rejected many of appellant's assignments of error or we have found the errors, if any, to be harmless. On this record, we cannot find that appellant was prejudiced by the cumulative effect of the errors, if any. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [rejecting claim of cumulative error].) Substantial evidence supports the jury's finding that appellant did not actually believe he was in imminent danger or needed to use deadly force. Sulpicio R. was 20 to 25 feet away when appellant began

21

shooting.  No witness observed or even suggested that Sulpicio R. had a weapon.  Appellant fired three shots at Sulpicio R., two of which hit him in the back and one of which hit him in the back of the arm.  Appellant then chased after Eduardo R. and fired at least two more shots at him.  On such a record, it is not reasonably probable appellant would have obtained a more favorable result absent the cumulative effect of the asserted errors.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

VI.    *Remand for Consideration of Whether to Impose Lesser Enhancement That Was Charged and Submitted to the Jury*

Next, relying on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), an opinion of this division, appellant argues we should remand for resentencing because the trial court "did not consider the possibility of imposing a lesser firearm enhancement under [section 12022.53,] subsections (b) or (c)."[12]  We recognize a panel of the Fifth District Court of Appeal disagreed with *Morrison* in *People v. Tirado* (2019) 38 Cal.App.5th 637, 643–644*,* review granted Nov. 11, 2019, S257658 (*Tirado*), when it held that section 12022.53, subdivision (h) does not authorize a trial court to substitute one enhancement for another.[13]  But because of the unusual procedural

---

[12] The Attorney General argues the claim is forfeited, but we decline to so find because appellant was sentenced before *Morrison* was decided.

[13] Our Supreme Court granted review in *Tirado* on the following question:  "Can the trial court impose an enhancement under Penal Code section 12022.53, subdivision (b), for personal use of a firearm, or under section 12022.53, subdivision (c), for personal and intentional discharge of a firearm, as part of its authority under section 1385 and subdivision (h) of section 12022.53 to strike an enhancement under subdivision (d) for personal and intentional discharge of a firearm resulting in death or great bodily injury, even if the lesser enhancements were not charged in the information or indictment and were not submitted to the jury?"  (See also *People v. Garcia* (2020) 46 Cal.App.5th 786 [agreeing with *Tirado*], review granted June 10, 2020, S261772, pending resolution of *Tirado*.)

history in this case regarding the firearm enhancements, outlined above, we find no tension between these cases as applied to the facts before us.

A.   *Governing Law*

" 'Section 12022.53 sets forth the following escalating additional and consecutive penalties, beyond that imposed for the substantive crime, for use of a firearm in the commission of specified felonies, including . . . murder:  a 10-year prison term for personal use of a firearm . . . (*id.*, subd. (b)); a 20-year term if the defendant "personally and intentionally discharges a firearm" (*id.,* subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes "great bodily injury" or "death, to any person other than an accomplice" (*id.*, subd. (d)).  For these enhancements to apply, the requisite facts must be alleged in the information or indictment, and the defendant must admit those facts or the trier of fact must find them to be true.' [Citation.]  Section 12022.53, subdivision (f) provides, 'Only one additional term of imprisonment under this section shall be imposed per person for each crime.  If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment . . . .' " (*Morrison*, *supra*, 34 Cal.App.5th at p. 221.)  However, under section 12022.53, subdivision (h), trial courts can "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

In *Morrison*, the prosecutor initially alleged lesser enhancements under section 12022.53, subdivisions (b) and (c), but later amended the information to remove them, leaving only the enhancement for personally discharging a firearm causing death under section 12022.53, subdivision (d).  The jury found this enhancement to be true.  (*Morrison*, *supra*, 34 Cal.App.5th at

p. 221.) *Morrison* held the trial court had discretion to impose one of the lesser enhancements. (*Id.* at pp. 222–223.) Because the record did not reflect the trial court was aware it could do so, *Morrison* remanded for resentencing. (*Id.* at pp. 223–224.)

In *Tirado*, only the greatest enhancement, that under section 12022.53, subdivision (d), was alleged and found true by the jury. The appellate court found that the sentencing court had no authority under those circumstances to substitute one of the lesser enhancements under the same statute. (*Tirado, supra*, 38 Cal.App.5th at p. 640, rev.gr.) But the Court of Appeal also noted that "the prosecution could have alleged all three section 12022.53 enhancements, and if it had done so, the jury would presumably have found all three true. In that circumstance, the court would have had the discretion to strike the section 12022.53, subdivision (d) enhancement and then either impose one of the other two enhancements or strike them as well." (*Id.* at p. 644.)

Similarly, in *Morrison*, this court observed that "[i]n a case where the jury had also returned true findings of the lesser enhancements under section 12022.53, subdivisions (b) and (c), the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice." (*Morrison, supra*, 34 Cal.App.5th at p. 222.) Thus, *Morrison* and *Tirado* agree that trial courts have discretion under section 12022.53, subdivision (h), to strike a greater enhancement and impose a lesser one when the prosecutor alleges the lesser enhancement and when the jury finds it to be true. That is essentially what happened here.

B.      *Remand for Consideration of Whether to Impose a Lesser Enhancement on Count 1*

As to the charge of murder, all three section 12022.53 enhancements were alleged.  For attempted murder, only the lesser two were alleged, given that Eduardo R. was not injured in the shooting.  The jury was instructed regarding the three different kinds of firearm enhancements based on section 12022.53, subdivisions (b), (c), and (d), and initially found them all true.  However, the trial court directed the jury to return a verdict on the greatest applicable enhancement only.  Accordingly, the jury crossed out its findings for the lesser enhancements and returned verdicts with the findings that appellant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) as to the murder, and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) as to the attempted murder.

At the sentencing hearing, the prosecutor pointed out that "[u]nder Penal Code [section] 12022.53[, subdivision] (h), the Court does have some discretion with regard to the gun enhancement."  The prosecutor requested a sentence of 15 years to life on the second degree murder conviction with an additional 25 years to life for the section 12022.53, subdivision (d) enhancement, and the prosecutor requested the midterm sentence of seven years on the attempted murder conviction plus 20 years for the section 12022.53, subdivision (c) enhancement.  Defense counsel requested the trial court "to exercise its discretion, to the extent that it can, to give the least amount of time to my client."

For the second degree murder conviction, the trial court sentenced appellant to an indeterminate term of 15 years to life, and "[f]or the true finding on the [section] 12022.53[, subdivision] (d) allegation, discharge of a firearm causing death, I'll impose an additional but consecutive term of 25 to life, decline to exercise my discretion to strike that enhancement, dismiss it

25

or strike punishment under [section] 12022.53[,subdivision] (h). [¶] For several reasons, I won't articulate all of them, but as I recall the testimony, most, if not all, of the entry wounds to [Sulpicio R.], the victim in Count 1, were on the backside. I know there was some dispute about one of those, whether or not it was—how it was inflicted. You do have Mr. Camarillo's behavior in the juvenile hall, and then, you know, shooting down [Sulpicio R.] wasn't enough, Mr. Camarillo then took off running after [Eduardo R.], the Count 2 victim. [¶] So it wasn't like he was ending the immediate threat he may have perceived and then just standing down. He took further action. [¶] It just doesn't seem like—I know he's young, he was 16 years old at the time, really tragic. [Jorge H.], 19 years old, I think. He's 19 now. . . . [Sulpicio R.], 19. All these folks were fairly young, except for, perhaps, [Eduardo R.]. I don't know if I heard evidence about his age. [¶] But I just think under these circumstances, the [section] 12022.53[, subdivision] (d) enhancement should stand as it was found true. So the total sentence on Count [1] will be 40 years to life."[14]

For the attempted murder conviction, the trial court indicated it waivered between imposing the midterm and the high term. "I know Mr. Camarillo had no real record to speak of, perhaps none at all. The People are requesting [the] midterm, probation recommended [the] midterm, so I'll go along with [the] midterm [sentence of] seven [years]. He was 16 at the time. [¶] . . . [¶] But, you know, his age, 16 at the time, the fact that there was no actual injury to [Eduardo R.], I'll go along with [the] midterm of seven. [¶] And I've waivered on this, but I think what I'm going to do on the [section] 12022.53[, subdivision] (c) enhancement to Count 2, I'm going to strike the

_____

[14] The presentence report indicates that appellant had two physical altercations with Sevren M. in juvenile hall.

26

punishment . . . . [¶] Primarily because of the defendant's age, primarily because there were no—there was no actual injury to [Eduardo R.], and also because [Eduardo R.] was not without blame for the incident. And then just overall, you look at this case, it was kind of a single event in this parking lot. And a total term of imprisonment of 45 years to life for the single use of one firearm, seems a bit on the excessive side."

Based on this record, and especially given the trial court's concern that its sentence seemed "a bit on the excessive side," we remand for the trial court to consider whether to strike the section 12022.53, subdivision (d) enhancement and impose a lesser enhancement in connection with appellant's second degree murder conviction. Applying either *Morrison*, *supra*, 34 Cal.App.5th at page 222 or *Tirado*, *supra*, 38 Cal.App.5th at page 644 (rev.gr.), the trial court has the authority to do so because the lesser enhancements were charged, submitted to the jury, and the jury initially found true all of the firearm enhancement allegations. But for the trial court's approach to the instructions and verdict forms, it would have found itself in exactly the position both *Morrison* and *Tirado* agree would permit it to impose lesser enhancements by striking greater ones.

We remand for resentencing because the record does not reflect the trial court was aware it could do so. We express no opinion as to how the trial court should exercise its discretion on remand.

VII. *The Fines and Fees*

At appellant's sentencing hearing, the court imposed a restitution fine of $10,000 (§ 1202.4, subd. (b)), a court operations assessment of $80 (§ 1465.8), and a conviction assessment of $60 (Gov. Code, § 70373).[15]

[15] The court also imposed but stayed a parole revocation fee of $10,000, pending appellant's successful completion of parole. Appellant does not challenge this fee on appeal.

27

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, decided after he was sentenced, appellant contends we should vacate the assessments and stay imposition of the restitution fine, or, alternatively, that we should remand the matter for an ability-to-pay hearing.  Our remand for resentencing obviates the need to consider appellant's challenge to the restitution fine and assessments because appellant may raise his objections concerning any perceived inability to pay at the resentencing hearing, should he choose to do so.

## DISPOSITION

We affirm the judgment of conviction.  We remand for resentencing consistent with this opinion.

_____
Reardon, J.*

WE CONCUR:


_____
Needham, Acting P. J.


_____
Burns, J.


A155577

_____
    * Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.