Filed 6/13/25  P. v. Andrade CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE LUIS ANDRADE, JR.,<br><br>    Defendant and Appellant. | F086496<br><br>(Super. Ct. No. CR-20-001788)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna F. Reeves, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Carly Orozco, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Jose Andrade, Jr., shot and killed Ralph Vigil outside of a motel.  He contends the court failed to instruct the jury on heat of passion and self-defense in a manner to account for his young age and the diminished judgment and

maturity that come with it.  He also challenges several sentencing decisions.  We reject those claims and affirm the judgment.

## BACKGROUND

In an information filed September 3, 2020, the Stanislaus County District Attorney charged Andrade with premeditated murder (Pen. Code,[1] § 187, subd. (a); Count 1), with a personal firearm use enhancement (§ 12022.53, subd. (d).)  Co-defendant Isabel Pastran was charged with accessory after-the-fact.  (§ 32.)

A jury found Andrade guilty of murder and found the firearm enhancement to be true.  The jury found the intentional, deliberate and premeditated allegation not true.  The court sentenced Andrade to a term of 15 years to life on the murder conviction, plus a consecutive term of 25 years to life on the firearm enhancement.

## FACTS

On January 29, 2020, Ralph Vigil went to the Venice Motel room of his friend, J.N.  They drank a couple beers together, and Vigil also had about "half a shot" of whiskey.  After about 10 minutes, Vigil said he needed to go see somebody and would be right back.  J.N. testified Vigil left without his bike, which remained with J.N.  However, surveillance video showed Vigil getting on a bicycle upon leaving the room, with a bottle in his hand.

Vigil's friend E.Y. had been out collecting recyclables that day and was approaching Almond Street when he saw Vigil on his bicycle.  He saw Vigil almost get hit by a car.  Vigil had to pick up the front wheel of his bicycle to avoid being hit.  Vigil got into an argument with someone in the car through the passenger-side window.  The passenger, later identified as Andrade, told Vigil they could "solve the problem or fight it out."  Andrade told Vigil to "meet up at Venice."  Vigil told E.Y. to come with him.

---

[1] All statutory references are to the Penal Code.

The car drove into the parking lot of the Venice Motel. Vigil approached the car saying things like, "let's fight" and "let's handle it." Vigil never threatened to kill Andrade, and had no weapons or other items in his hands. E.Y. got his first glimpse of the driver, who was female. She exited and told them to "stop" and that they "don't have to do this." Andrade exited the vehicle, acted as if he were going to punch Vigil, and then pulled out a gun and shot Vigil. E.Y. "believe[d]" Andrade fired three shots. Vigil said "why," and ran away towards room 105, and fell down. Vigil tried to get on his bike, but could not. Andrade and the female got into the car and "took off."

A minute or two after Vigil left the room, J.N. heard gunshots. Vigil ran across the parking lot and told J.N. to open the door. Vigil ran inside and said he had been shot. J.N. called 9-1-1. Vigil initially laid on the bed, then got up and laid on the front porch.

J.N. never saw Vigil with any weapons that day.

Officer Donna Anthieny with the Turlock Police Department responded to the Venice Motel after dispatch received a call at 10:06 p.m. When she arrived, individuals were standing in the parking lot flagging officers down. There was a male lying on the ground in an island grass area in front of a room. He identified himself as Ralph Vigil.

Vigil was grunting and moaning in pain. He said he had been shot once in the front and once in the back. Vigil said he did not know who shot him.

Officer Anthieny was unable to locate the front wound that was causing a pool of blood on his chest. However, she did locate the wound on his back and began rendering aid.

One of the bullets had entered the left side of Vigil's abdomen. Vigil also had an exit wound on the right side of his back. A bullet had penetrated his stomach, duodenum, pancreas and mesentery. Vigil died during emergency surgery performed in response to his gunshot injury.

The car Andrade was in at the time of the incident was silver, except for the hood which was black. The car also had a dark colored stripe on its left front fender.

3.

Officer Anthieny testified that the police department receives many calls to respond to crime in the area of the Venice Motel.

*Co-defendant Pastran's Testimony*

Pastran testified to a different version of events. As Pastran was leaving her father's house on January 29, 2020, she saw that the driver's side door of her car was open. The seats had been moved and items were missing from inside the car. Pastran saw a couple people on bicycles nearby. Andrade asked one of the people, who turned out to be Vigil, if he had broken into the car. Vigil said no, and said that he could have Andrade "erased." Pastran understood this to mean Vigil could have Andrade killed. Vigil said they "didn't know who [they] were fucking with." During this encounter, a tall man driving a white Malibu said, "watch your backs" and that "somebody" was going to "get" them.

Pastran denied telling Vigil to meet them at a hotel. She also said she never heard Andrade tell Vigil to meet him at the Venice Motel.

Pastran drove herself and Andrade to visit her mother, who was living at the Venice Motel. She denied almost hitting anyone with her vehicle. Nonetheless, Vigil followed her vehicle to the Venice Motel. Vigil threatened Andrade, saying he would have him "erased," that he was 51 years old and had family members "to take care of his problems[.]" Vigil was being loud and aggressive, and had a bottle in his hands. Andrade got out of the car and spoke with Vigil. Pastran claimed in her testimony that she stopped paying attention to their exchange because she was planning to get out and talk to her mother. Vigil then approached Andrade. At some point, Pastran realized Vigil had been shot. Pastran pushed Andrade into the car and drove away.

Pastran did not turn herself in after the incident because she was six months pregnant. Pastran later helped remove black stickers from the car involved in the incident.

*Further Dispute Over Subject of Disagreement Between Vigil and Andrade*

4.

Pastran's mother, Patricia, claimed in her testimony that she told a Detective Frank Navarro that the dispute was about someone breaking into the car and saying, "I'll blast you." Patricia testified that she never heard anything about someone cutting another person off. However, Detective Navarro testified that, on the day after the incident, Patricia told him the argument had been about someone cutting someone else off. In a second interview less than one month later, Patricia again told Navarro the argument was about someone cutting someone else off. Patricia never told Navarro someone had said, "I will blast you." Patricia told Navarro she saw or heard Andrade shoot Vigil four times.

*Pastran's Prior Inconsistent Statements*

Pastran told Navarro she was not involved in the homicide, was not driving the car, and that the people depicted in video footage of the incident were not her and Andrade.

In her interview with Navarro, Pastran said that as she was leaving the house, the driver's side door of the car was open. She saw one person on a bicycle (not a "couple"), and claimed the person was staring at them. She thought the person was trying to steal the car, so she followed the person. The person tried to hide behind trash cans.

Pastran did not say anything to Navarro about multiple people on bicycles outside her father's house, nor anything about a man in a white Malibu who told them to "watch their backs," nor anything about Vigil saying he had family to take care of his problems or that he would have them erased. Pastran told Navarro that Vigil had no weapons.

## DISCUSSION

### I. Andrade has not Established Instructional Error

Andrade contends the court's instructions on self-defense and heat of passion, based on CALCRIM Nos. 505, 570, and 571, were insufficient.

#### A. Background

The court instructed the jury with CALCRIM No. 505 as follows:

"The defendant Jose Andrade is not guilty of murder if he was justified in killing someone in self-defense or defense of another.

"The defendant acted in lawful self-defense or defense of another if:

"Number one, the defendant reasonably believed that he or Defendant Isabel Pastran was in imminent danger of being killed or suffering great bodily injury.

"Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

"And, three, the defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient no matter how great or likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else.

"The defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether defendant's beliefs were reasonable, consider all the circumstances as they were known to and appear to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not have to actually existed.

"Defendant Andrade's belief that he or Defendant Pastran was threatened may be reasonable even he relied [*sic*] on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"If you find that Ralph Vigil threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"If you find that the defendant knew that Ralph Vigil had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

6.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself, and if reasonable necessary to pursue an assailant until the danger of great bodily injury has passed. This is so even if safety could have been achieved by [retreating].

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

The court instructed the jury with CALCRIM No. 571 as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.

"If you conclude that the defendant acted in complete self-defense or defense of another, his action was lawful, and you must find him not guilty of any crime.

"The difference between complete self-defense or defense of another and imperfect self-defense or defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense or imperfect defense of another if:

"One, the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury.

"And, two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger.

"But, three, at least one of those beliefs were unreasonable.

7.

"Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be. In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"A danger is imminent if when the fatal wound occurred the danger actually existed or the defendant believed it existed. The danger must seem immediate and present so that it must be instantly dealt with. It may not be merely prospective or in the near future. Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"If you find that Ralph Vigil threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs. If you find that the defendant knew that Ralph Vigil had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find that the defendant received a threat from someone else that he associated with Ralph Vigil, you may consider that threat in evaluating the defendant's beliefs."

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

The court instructed the jury with CALCRIM No. 570 as follows:

"Provocation may reduce a murder from first degree to second-degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first- or second-degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"One, the defendant was provoked.

"Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment.

"And, three, the provocation would have caused a person of average disposition to act rashly and without due deliberations that is from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation, as I have defined it.

"While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.

"In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

B.  Claim of Instructional Error

Andrade observes that these three sets of instructions essentially call for the jury to make a reasonableness determination.  Specifically, as to perfect and imperfect self-

9.

defense, the jury needed to determine whether Andrade's beliefs were reasonable. As to heat of passion, the jury needed to determine whether the provocation would have caused "a person of average disposition" to act rashly and without due deliberation and whether "a person of average disposition" would have cooled off.

Andrade contends the court should have instructed the jury to determine whether a reasonable person "*of like age, intelligence, experience, and prudence*" would have (1) believed in the need for self-defense, (2) been provoked to rash action, (3) have cooled of by the time of killing, etc. He contends that research indicates the areas of the brain responsible for judgment and decision-making are still developing in teenagers and young adults.

### C. Law

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

" 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions as a whole, not in isolation. [Citation.] "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 544.)

D.  Analysis

As explained below, the authorities cited by Andrade do not suggest trial courts must or should instruct a jury to compare a young defendant to a reasonable person "of like age, intelligence, experience and prudence."

Andrade cites four United States Supreme Court cases.  The first is *J.D.B. v. North Carolina* (2011) 564 U.S. 261, which held that age must be considered in determining whether an individual was "in custody" for *Miranda*[2] purposes.  He then points to *Miller v. Alabama* (2012) 567 U.S. 460, which held that a sentencing scheme requiring punishment of homicide with life imprisonment without possibility of parole without consideration of age and age-related characteristics violates the Eighth Amendment. Next, he relies on *Graham v. Florida* (2010) 560 U.S. 48, which found unconstitutional the practice of sentencing juveniles who did not commit homicide to life in prison without the possibility of parole.  He also points to *Roper v. Simmons* (2005) 543 U.S. 551, which concluded that it is unconstitutional to execute criminals who committed their crime before the age of 18.

To describe these cases is to distinguish them.[3]  Putting aside the fact that Andrade is not a juvenile, these cases are only vaguely related to the issue at hand, in that they support the general developmental proposition that juveniles are less able to exercise mature judgment than adults, more susceptible to peer pressure, and have less-developed character.  But they offer no support for the claim that trial courts must expressly instruct juries to compare Andrade to a reasonable person "of like age, intelligence, experiences and prudence" when evaluating the objective prong of heat of passion.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

[3] Similarly, Andrade's citation to natural and probable consequences cases is unpersuasive.

11.

Similarly, the fact that the Legislature has extended Youth Parole Hearings to offenders in their early twenties is of limited relevance. (See § 3051.) Parole decisions are inherently subjective, unlike the objective prong of the heat of passion determination.

Andrade's analogies to other classes of defendants are also unpersuasive. For example, he observes that cases have held expert testimony on domestic violence can be relevant to determining whether a defendant's actions were reasonable. However, whether a particular factor is "relevant" is a much lower bar than whether a court must expressly instruct the jury to consider that factor. Second, even in the situation cited by Andrade, "the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1087.)

Andrade also presents the analogy of a "chronically homeless" defendant. He observes that expert testimony on chronic homelessness was held to be relevant in *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732. But, again, whether evidence concerning a defendant's personal situation is relevant is a different question than whether a trial court reversibly errs by failing to expressly instruct a jury to consider that factor. In any event, while *Sotelo-Urena* held that the jury was to consider the defendant's situation and knowledge, the question remained "what a reasonable person would have believed about the need to use lethal force." (*Id* at p. 752.)

Nor do we find the comparison to a defendant with hearing and sight impairments persuasive. In *People v. Mathews* (1994) 25 Cal.App.4th 89 (*Mathews*), the defendant pointed a gun at an officer. However, the defendant testified he was blind and hearing impaired, did not know the intruders were police and did not hear the officer's verbal announcements. (*Id* at p. 94.) The defendant requested a jury instruction that would have the jury consider his impairments when evaluating what a reasonable person would have done in terms of self defense. (*Id* at pp. 98-99.) The trial court refused to instruct on impairment, and the appellate court reversed.

While the *Mathews* court phrased its holding in terms of applying a standard of "reasonable person *with a similar physical disability*," we actually believe the ultimate holding is consistent with the normal reasonable person standard.  Under the normal approach, we look at the defendant's *specific* situation and knowledge and *then* ask what a reasonable person *in that situation and with that knowledge* would have believed about the need for lethal force.  Applying that in *Mathews* would mean that the jury asks whether a reasonable person, when confronted with intruders of *unknown* intent and without hearing any verbal announcements signaling the intruders were law enforcement, would have believed in the need for self-defense.  In other words, while the comparator is a generalized reasonable person, we attribute to that person the *actual* knowledge of the specific defendant.  We import only the reasonable person's *disposition*, not their ability to perceive sensory inputs.  Doing that in *Mathews* would account for the lessened knowledge the defendant had due to his disabilities.

What Andrade asks for in this case is different.  He does not want to ensure the hypothetical reasonable person merely has the exact same information as he had, but instead that the hypothetical person to whom he is compared has a different *disposition* – i.e., less-developed character, increased susceptibility to peer pressure, etc. than the standard "reasonable person" applied to older defendants.  But using a reasonable person's disposition is the entire purpose of the objective tests in which they are employed.  Consequently, it is far different than the instruction requested in *Mathews*.

We conclude the trial court did not err in failing to instruct the jury as suggested by Andrade.  By extension, counsel was not ineffective for failing to request an unnecessary and likely erroneous instruction.[4]

---

[4] Given these conclusions, we do not reach the Attorney General's arguments concerning forfeiture of this issue.

13.

II.     The Trial Court did not Err in Refusing to Strike the Firearm Enhancement

Before sentencing, Andrade requested that the court dismiss the firearm enhancement imposed under section 12022.53, subdivision (d).  He observed that he had no criminal record.

At sentencing, the trial court announced its tentative decision to impose the firearm enhancement.  Andrade urged the court to strike the enhancement under section 1385.  Counsel argued that the mitigating circumstance of Andrade's age was entitled to "great weight."

The trial court ruled as follows:

> "THE COURT: I did spend considerable time thinking about both Mr. Andrade and Ms. Pastran's potential sentence, and I did factor into the equation that I know Mr. Andrade because of his age will be eligible for consideration under the youthful offender parole statutes.

> "I also carefully read [trial counsel's] paperwork and considered whether it would be appropriate to reduce the gun enhancement in this situation.  I don't agree with the characterization of the facts of the case – I don't agree 100 percent with either way the two of you see it.  I see it somewhere in the middle.

> "When you bring a gun to a fistfight that's always bad, but the video in my view leans heavily against Mr. Andrade because of the demeanor and the mannerisms demonstrated appeared to this Court to be intentional, not in self-defense.

> "I know that there was a lot of argument seeing it a different way, but that's the way I viewed it.  And it displayed in my view a high degree of viciousness and immaturity at the finality of the act.  So the Court's indicated is going to stand."

The court then imposed a consecutive sentence of 25-years-to-life on the enhancement.

*Law*

"Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so[.]"  (§ 1385, subd. (c)(1).) " In exercising its discretion

14.

under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."  (§ 1385, subd. (c)(2).)

Among the mitigating circumstances is subparagraph (C), which applies when "The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."  (§ 1385, subd. (c)(2)(C).)

Section 12022.53 also provides that its enhancements may be stricken or dismissed "in the interest of justice pursuant to section 1385[.]"  (§ 12022.53, subd. (h).)

*Standard of Review*

"We review a trial court's order denying a motion to dismiss a sentence enhancement under section 1385 for abuse of discretion."  (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

*Analysis*

Andrade argues that striking the enhancement would have been "appropriate" considering his age and criminal history along with the circumstances of the shooting. However, the question before us is not whether striking the enhancement would have been appropriate.  Instead, the question is whether *declining* to strike the enhancement is *inappropriate* – i.e., whether that decision was irrational or arbitrary. If both sentencing options would have been appropriate or reasonable, then there is no error and we uphold the trial court's decision.

15.

Andrade points to factors in his favor: he was a relatively young adult, he had no criminal history, the enhancement would increase his sentence to more than 20 years in prison, and dismissal of the enhancement would not result in his immediate release thereby protecting the public. However, the existence of factors in his favor is not enough. Because while there were considerations in his favor, there were also considerations on the other side. For one, the trial court concluded he did not act in self-defense. The court also concluded he acted with a high degree of viciousness.[5] Since the trial court's approach was well-supported and within its discretion, it is irrelevant that it alternatively *could* have ruled in Andrade's favor by relying on different factors than it did.

Andrade contends that the court's reliance on the viciousness of the crime indicates it was focused on his current dangerousness. He urges that, under cases like *People v. Gonzales* (2024) 103 Cal.App.5th 215 and *People v. Williams* (2018) 19 Cal.App.5th 1057, courts in that situation must consider *future* dangerousness. But current dangerousness is probative as to future dangerousness. Someone who is dangerous today is likely to be dangerous tomorrow. Indeed, how else could future dangerousness be assessed? As with any prediction of future conduct, the only option courts have is to take past and present circumstances and make reasonable extrapolations thereon. By definition, these extrapolations cannot be proven to a certainty, but that does not make them improper.

Finally, Andrade contends the court erred in citing the "immaturity" he exhibited in committing the crime. He argues that because immaturity is a trait often associated

---

[5] While Andrade contends the circumstances of the shooting are in his favor because Vigil allegedly initiated the altercation, we will not disturb the trial court's factual conclusions. The trial court's finding of viciousness is supported by substantial evidence, including the video evidence cited in its ruling.

with youth, the trial court's use of it to aggravate rather than mitigate the sentence was error.

Andrade essentially adopts the least charitable interpretation of the trial court's comment. Using an abuse of discretion standard, we will not view a sentencing court's comments in the least favorable light possible. While "immaturity" can mean "lacking complete growth, differentiation, or development," it can also mean "exhibiting less than an expected degree of maturity." (Merriam-Webster Unabridged Dict. Online (2025) <https://www.merriam-webster.com/dictionary/immaturity> [as of June 12, 2025], archived at https://perma.cc/GP2X-7CXJ, at adjective, ¶ 1(a), (b).) A reasonable interpretation of the court's comment – perhaps the most reasonable interpretation – is that Andrade's conduct exhibited less than the expected amount of maturity. Recall that Andrade was an adult. While some development may occur well into our twenties, it is not unreasonable to expect adults, even younger adults, not to shoot someone in anticipation of a fist fight.

### III. The Trial Court did not Err in Sentencing Andrade to 25-Years-to-Life on the Firearm Enhancement

Andrade alternatively asked that, pursuant to *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), the court impose an enhancement carrying a 10-year sentence (§ 12022.53, subd. (b)) instead of the enhancement carrying a 25-years-to-life sentence. The trial court declined to do so.

Andrade contends that for the "same reasons" urged for striking the enhancement under section 1385, the court should have selected a lighter enhancement under *Tirado*. Because we rejected that prior argument, we also reject the present one. We cannot say that no reasonable jurist would agree with the court's decision to credit factors against more lenient sentencing (e.g., viciousness of the crime) over factors in favor of more lenient sentencing (e.g., relative youth, etc.). Consequently, we decline to disturb the trial court's ruling for the same reasons.

**DISPOSITION**

The judgment is affirmed.


FAIN, J.*

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.